UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

JUSTIN GARMON ,

Plaintiff,

v.

PLAID PANTRIES,

Defendant.

Case No.: 3:12-CV-1554-AC

OPINION AND ORDER

---

ACOSTA, Magistrate Judge:

*Introduction*

Plaintiff Justin Garmon ("Garmon") filed this action against his employer Plaid Pantries, Inc., ("Plaid") alleging that Plaid demoted him in retaliation for his requesting and taking medical leave to which he was entitled under the Family and Medical Leave Act of 1993 (29 U.S.C. §§ 2601-2654)(the "Federal Act") and the Oregon Family Leave Act (OR. REV. STAT. 659A.150-

659A.186)(the "Oregon Act"), and for reporting unlawful employment practices in violation of a state whistleblower statute (OR. REV. STAT. 659A.199)(the "Whistleblower Statute") Garmon also asserts a claim for wrongful termination alleging that after he engaged in this protected conduct, his working conditions became so intolerable that he was forced to resign.

Presently before the court is Plaid's motion for summary judgment on all claims asserted by Garmon and various evidentiary objections to Garmon's evidence. The court finds that Garmon's affidavit is not a "sham affidavit," but that paragraphs 120 and 121 of that affidavit are directly contradictory to Garmon's deposition and are stricken. Plaid's relevance objections are premature at this summary judgment stage and will not be considered independently by the court. The exhibits objected to as hearsay either fall within an exclusion to the hearsay rule or are not offered for the truth of the matter asserted and are, therefore, not hearsay. While Garmon fails to properly authenticate his deposition excerpts, all of the transcripts were also offered, and properly authenticated, by Plaid and will be considered. Plaid is entitled to summary judgment on Garmon's claims under the Federal Act, the Oregon Act, and the Whistleblower Statute with regard to all adverse employment actions other than the reduced hours assigned to Garmon after he took protected leave and the refusal to return Garmon to his previous position based on the reduced hours.[1]

*Preliminary Procedural Matters*

In its reply brief, Plaid objects to the filing of Garmon's declaration, numerous paragraphs within Garmon's declaration, and a few exhibits on various evidentiary grounds. In accordance with L.R. 56-1(b), Garmon was given an opportunity to respond to these objections. The objections are

[1]The parties have consented to jurisdiction by magistrate in accordance with 28 U.S.C. § 636(c)(1).

now fully briefed and properly before the court.

I. Sham Affidavit

Plaid moves to strike Garmon's affidavit in its entirety, arguing that numerous discrepancies between Garmon's affidavit and his earlier deposition testimony establish the document as a "sham affidavit". The Ninth Circuit has held that an genuine issue of fact cannot be created by an affidavit that contradicts prior deposition testimony. *Rabobenko v. Automated Equip. Corp.*, 520 F.2d 540, 544 (9th Cir. 1975). The court reasoned that "'[i]f a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact.'" *Id.* (quoting *Perma Research & Dev. Co. v. Singer Co.*, 410 F.2d 572, 578 (2nd Cir. 1969)). This rule, regularly referred to as the "*Foster-Rabodenko* rule", applies to conflicts between affidavits and interrogatory responses as well as deposition testimony. *School Dist. No. 1J, Multnomah County v. ACandS, Inc.,* 5 F.3d 1255, 1264 (9th Cir 1993). The Ninth Circuit has held that the *Foster-Rabodenko* rule should be applied with caution.

> [T]he *Foster-Radobenko* rule does not automatically dispose of every case in which a contradictory affidavit is introduced to explain portions of earlier deposition testimony. Rather, the *Radobenko* court was concerned with "sham" testimony that flatly contradicts earlier testimony in an attempt to "create" an issue of fact and avoid summary judgment. Therefore, before applying the *Radobenko* sanction, the district court must make a factual determination that the contradiction was actually a "sham".

*Kennedy v. Allied Mutual Ins.*, Co., 952 F.2d 262, 266-67 (9th Cir. 1991). "The non-moving party is not precluded from elaborating upon, explaining or clarifying prior testimony elicited by opposing counsel on deposition; minor inconsistencies that result from an honest discrepancy, a mistake, or newly discovered evidence afford no basis for excluding an opposition affidavit." *Messick v.*

*Horizon Indus., Inc.*, 62 F.3d 1227, 1231 (9th Cir 1995).

Much of Garmon's affidavit contains either new information not elicited by Plaid's counsel at Garmon's deposition or information that supplements Garmon's deposition testimony without specifically contradicting it. For example, when asked at his deposition whether he discussed Nelson's comments regarding his absences or how Nelson calculated inventory during his July 2011 review, Garmon responded "No". In his affidavit, however, he represented that he did discuss an associate's chronic lateness, his upcoming surgery, and his frequent illnesses during that review. These statements are not contradictory. Similarly, Garmon's deposition testimony that he told Nelson he was not feeling well the morning of August 5, 2011, but not that he would be leaving early, does not conflict with his affidavit testimony that he told Nelson that he was not well and may need to leave early. Again, these statements are not contradictory. Finally, Garmon testified in his deposition that he did not remember calling his store the evening of August 5, 2011, but stated in his affidavit that he received a call from the associate covering the store that evening. The fact that Garmon did not remember placing a call does not contradict the later statement that he received a call.

To the extent some minor discrepancies may exist between Garmon's affidavit and his prior sworn testimony, the affidavit does not "flatly contradict" the deposition testimony and does not appear to have been made for the purpose of creating an issue of material fact. Garmon's affidavit, as a whole, is not a sham, and the *Radobenko* sanction of striking the entire affidavit does not apply. Thus, Plaid's motion to strike Garmon' s affidavit in its entirety is denied. The affidavit will remain part of the summary judgment record. However, there are two areas of testimony where Garmon's affidavit clearly contradicts his deposition testimony.

Garmon testified at his deposition that in response to complaints made by him, a meeting involving himself and Plaid management was scheduled to occur on February 24, 2012, and that he sent an email to management on February 23, 2012, indicating that he was suffering from a cold and would not be available for the meeting the next day. (Garmon Dep. 133:5-8; 133:21-134:3.) However, in his declaration he states that "[o]n February 24, 2012, there was an impromptu meeting that occurred at the Hillsboro Store for which I received no advance notice." (Garmon Aff. ¶120.) Garmon's affidavit clearly contradicts, not just explains or clarifies, the statement he made in his deposition that he was aware of the meeting, asked to reschedule it, and that no meeting occurred on February 24, 2012. The court will disregard Garmon's comments about an impromptu meeting on February 24, 2012, found in his affidavit and will rely on the testimony he gave at his deposition with regard to this scheduled, but cancelled, meeting.

The next direct contradiction relates to Garmon's shift on March 7, 2012. At his deposition, Garmon testified that he did not give Hale advance notice that he would miss his entire shift on March 7, 2012, due to a doctor's appointment. (Garmon Dep. 141:6-24.) In his affidavit, Garmon represents that when he learned he was scheduled to work a shift starting at 1:00 p.m. on March 7, 2012, he informed Hale that he had a doctor's appointment at 3:00 p.m. that day and Hale told him not to worry about it. (Garmon Aff. ¶ 121.) Again, Garmon's affidavit flatly contradicts his deposition testimony and will be disregarded by the court. Instead, the court will rely on Garmon's testimony with regard to his missing work on March 7, 2012.

II. Relevance

Plaid also moves to strike specific paragraphs in Garmon's affidavit, arguing that the paragraphs which concern alleged events occurring between 2004 and 2007, or the paperwork

process related to Garmon's request for medical leave, are not relevant to the issues before the court. At the summary judgment stage, the court must look at the evidence presented to it by the parties and, initially, determine if there is a genuine issue of material fact. While engaging in this task, the court must necessarily apply the underlying summary judgment standard when it encounters evidence that is irrelevant, speculative, ambiguous, argumentative, or constitutes a legal conclusion exclusively within the purview of the court's consideration. *See Burch v. Regents of Univ. of California*, 433 F. Supp. 2d 1110, 1119 (E.D. Cal 2006)(noting that various evidentiary objections, such as relevance, were redundant at the summary judgment stage where the court can award summary judgment only in the absence of a genuine issue of material fact based on evidence the contents of which must be admissible). It is a waste of the court's time to analyze the parties' objections to the evidence on any of these grounds independently of its consideration of the merits of the underlying summary judgment motions. To the extent the court finds the information in these paragraphs relevant to the issues before the court, they will be considered. Plaid's objections to the paragraphs will not be considered independently of this analysis.

III. Hearsay

Plaid objects to the consideration of Exhibits Y, Z, and DD to the Garmon affidavit and Exhibit F to the Gaddis declaration asserting that the exhibits contain hearsay not subject to any hearsay exception. The Ninth Circuit has generally applied the limitations found in the hearsay rule, set forth in Rule 802 of the Federal Rules of Evidence, to evidence offered by the parties at the summary judgment stage. *Orr*, 285 F.3d 764, 778; *Beyenne v. Coleman Sec. Services, Inc.*, 854 F.2d 1179, 1182 (9th Cir. 1988). Hearsay is defined as an out-of-court statement offered in evidence to prove the truth of the matter asserted. FED. R. EVID. 801 (2013). Hearsay is admissible only if it

qualifies as an exception to the general hearsay rule. FED. R. EVID. 802 (2013).

Garmon asserts that the statements in Exhibit Y (a CD of a meeting between Garmon and Plaid management) and Exhibit Z (a transcript of phone conversation between Garmon and his district manager) are statements made by Plaid offered against it and, therefore, properly excluded from the hearsay rule. Rule 801, which identifies exclusions from the hearsay rule, provides that statements by a party opponent offered against an opposing party are excluded from the hearsay rule. FED. R. EVID. 801(d)(2) (2013). To qualify as a statement by a party-opponent under Rule 801(d)(2), the statement must be: (A) the party's own statement, in either an individual or a representative capacity; (B) a statement of which the party has manifested an adoption or belief in its truth; (C) a statement by a person authorized by the party to make a statement concerning the subject; (D) a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship; or (E) a statement by a coconspirator of a party during the course and in furtherance of the conspiracy. FED. R. EVID. 801(d)(2) (2013).

Here, the parties making the statements offered by Garmon in Exhibits Y and Z are all in management positions with Plaid who had supervisory authority over Garmon and the statements were made with regard to Garmon's employment with Plaid. Accordingly, the statements were made by a party authorized to speak on behalf of Plaid with regard to Plaid's associates and fall either within subsection (C) or (D) of the exclusion to the hearsay rule. The exhibits are admissible and will be considered by the court.

Garmon represents that he is offering Exhibit F to the Gaddis declaration (a copy of the complaint filed with Bureau of Labor and Industry ("BOLI")) and Exhibit DD to the Garmon

affidavit (a copy of email messages sent to Plaid management advising them that Garmon believed Plaid was violating the law) not for the truth of the matter asserted therein, but merely to establish that a BOLI complaint was filed and that Garmon complained to Plaid of what he believed was a violation of law, rule, or regulation. When considered in this context, these exhibits are not hearsay and are admissible.

IV. Authentication of Deposition Transcripts

Finally, while Plaid does not object to the deposition transcript pages offered by Garmon, the court notes that they do not include signed reporters' certificates and are, therefore, not properly authenticated. Evidence presented in support of or in opposition to a motion for summary judgment must be based on personal knowledge, properly authenticated, and admissible under the Federal Rules of Evidence. FED. R. CIV. P. 56(e). "The requirement of authentication * * * as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." FED. R. EVID. 901(a) (2013). Evidence that is not properly authenticated will not be considered by the court when reviewing a motion for summary judgment. *Orr v. Bank of America*, 285 F.3d 764, 773 (9th Cir. 2002).

The Ninth Circuit stated in *Orr* that:

> A deposition or an extract therefrom is authenticated in a motion for summary judgment when it identifies the names of the deponent and the action and includes the reporter's certification that the deposition is a true record of the testimony of the deponent. See Fed. R. Evid. 901(b); Fed. R. Civ. P. 56(e) & 30(f)(1). Ordinarily, this would be accomplished by attaching the cover page of the deposition and the reporter's certification to every deposition extract submitted. It is insufficient for a party to submit, without more, an affidavit from her counsel identifying the names of the deponent, the reporter, and the action and stating that the deposition is a "true and correct copy." Such an affidavit lacks foundation even if the affiant-counsel were present at the deposition.

*Orr*, 285 F.3d at 774 (footnote and case citations omitted). Plaid, however, has offered and properly authenticated a number of excerpts from the depositions of the same individuals, thereby providing the basis for their admissibility. In *Orr*, the Ninth Circuit held that:

> when a document has been authenticated by a party, the requirement of authenticity is satisfied as to that document with regards to all parties, subject to the right of any party to present evidence to the ultimate fact-finder disputing its authenticity.

*Orr*, 285 F.3d at 776. The deposition excerpts offered by Garmon are consistent, both in content and appearance, with the properly authenticated excerpts offered by Plaid. Consequently, the court will consider Garmon's deposition transcripts in this Opinion.

*Background*

Garman has spent most of his adult life working at Plaid. (Garmon Aff. ¶ 4.) In November 2003, Plaid hired Garmon, then twenty years old, as an associate in the Wilsonville store ("Store 129"). (Garmon Aff. ¶ 4.) Plaid promoted Garmon to assistant manager in early 2004, and then to store manager in July, 2004. (Garmon Aff. ¶¶ 4, 6.) As a store manager at Store 129, Garmon always worked the morning shift Monday through Friday, beginning at 6:00 a.m. and ending between 2:00 and 4:00 p.m., and weekends, depending on need. (Garmon Aff. ¶ 9.) Garmon continued as store manager of Store 129 until August 10, 2011, when he was demoted to the position of assistant manager and transferred to another store. (Garmon Aff. ¶ 51.) Garmon asserts that he was demoted in retaliation for requesting medical leave. Plaid represents that it demoted Garmon based on Garmon's continuing failure to work his required hours. Garmon eventually resigned from his employment with Plaid on March 8, 2012, stating that he could no longer work under the hostile environment to which he was being subjected. (Garmon Aff. ¶ 122.)

In the years leading up to Garmon's demotion, Garmon's supervisors regularly expressed

concern over Garmon's failure to be at his store during hours required of managers, or inform supervisor of his absence and find coverage when he was not able to be at the store. In each of the written counseling documents, Garmon was advised that the associate must take designated steps to improve their performance and that "[f]ailure to improve may result in disciplinary action or may result in termination of employment." (Garmon Aff. Exs. B-K.)

In a counseling document dated September 25, 2005, identified as a "final written consultation, Suzi Stark ("Stark"), the then area manager for the area including Store 129, advised Garmon that he "may not come & go as you please without notifying the Area Manager." (Garmon Aff. Ex. B at 1.) Garmon called in sick on September 20, 2005, with swollen tonsils, and then on September 21, 2005, with an earache. (Garmon Aff. Ex. B at 2.) Stark advised Garmon that he needed to see a doctor and provide Plaid with a doctor's excuse for the missing days. (Garmon Aff. Ex. B at 2.) Garmon worked on September 22, 2005, but failed to provide the doctor's excuse and when questioned by Stark that afternoon about the excuse, explained that he was on his way to a concert in Eugene and would not be able to get it that day. (Garmon Aff. Ex. B at 2.) On September 23, 2005, Garmon was late to work and reported that he was sick and running a fever. (Garmon Aff. Ex. B at 2.) When Stark arrived at Store 129, "it was a disaster." (Garmon Aff. Ex. B at 2.) Tuesday's inventory remained in the totes on the main floor and Garmon was only about halfway through invoices. (Garmon Aff. Ex. B at 2.) Stark asked Garmon if he could do the cash, take the deposit to the bank, and get coins for the weekend. (Garmon Aff. Ex. B at 2.) Garmon refused, complained again that he was sick, and went home. (Garmon Aff. Ex. B at 2.) Garmon worked a few hours the following day to finish his computer work but did not call Stark to let her know he was leaving early again or that he was sick. (Garmon Aff. Ex. B at 2.) Garmon signed the counseling

document on September 26, 2005. (Garmon Aff. Ex. B at 1.)

Chad Nelson ("Nelson"), the area manager who replaced Stark and became Garmon's immediate supervisor, consistently expressed concern over Garmon's presence in Store 129 during the required hours. (Nelson Dep. 6:8-10, 8:1-14.) On January 18, 2006, Nelson authored two counseling documents, identified as written consultations. The first one addressed Garmon's calling in sick on January 11, 2006, without arranging for coverage, or even calling Store 129 or other employees in an attempt to arrange coverage. (Garmon Aff. Ex. C at 1.) Nelson indicated that "this is behavior expected of an associate, not a manager." (Garmon Aff. Ex. C at 1.) He advised Garmon that "[w]hen sick it is the responsibility of the manager to be sure the scheduling of the store is covered. Calling in sick with no plan of how to solve the problem is not acceptable." (Garmon Aff. Ex. C at 1.) Garmon explained in a written response that he tried to call three employees the previous night, was unable to talk with them, and did not leave a message. (Garmon Aff. Ex. C at 2.) As a result, the associate working the graveyard shift had to work Garmon's shift as well. (Garmon Aff. Ex. C at 2.) Garmon indicated:

> I was under the assumption that in this company we work as a team. I was hoping Chad would be a team player and would make some kind of effort to find somebody to cover the shift for me. . . . I find that stating that it is to be expected from an associate and not a manager is appalling. Having a person call around when [they're] sick and have a sore throat I find to be unacceptable.

(Garmon Aff. Ex. C at 2.)

The second counseling document addressed Garmon's leaving Store 129 at noon on Monday, January 16, 2006, and arriving four hours late the next morning ("well after 10:00 am"), Tuesday, January 17, 2006, both without notice or explanation to Nelson. (Garmon Aff. Ex. D at 1.) In a responsive document signed by Garmon, Garmon explained that he had scheduled his swing shift

to arrive early on January 16, 2006, at noon, so that Garmon could get his work done and be out by 2:00 p.m., and that he had not left Store 129 until 1:36 p.m. that day. (Garmon Aff. Ex. D at 2.) He also indicated he had an agreement with Nelson allowing him not to work a whole shift on Tuesdays in light of the fact that he frequently had to come in on Saturday and Sunday to take care of cash, books, and paperwork. (Garmon Aff. Ex. D at 2.) Garmon complained that he did not have an assistant manager, was doing the best he could with what he had been given, and would like to have a personal life outside of Plaid. (Garmon Aff. Ex. D at 2.)

On April 25, 2006, Nelson prepared another counseling document, identified as a "Final Written Consultation". (Garmon Aff. Ex. E.) Nelson wrote:

> Today April 25th Justin was working in his store from 6:08 am →8:40 am. He is being paid for working the day shift which would be approx. 6 am → 2 pm. Justin had been told he may leave early on freight days, (which this was) after all of the work is complete. Freight had not been completely put away, the cooler had not been organized, and no invoices had been entered for the week. All of this should have been done, as the inventory field audit was scheduled for the next morning. Justin did not count cigarettes today, after his count on Monday was "thousands" off. I have told Justin before that accurate cigarette counts are a requirement especially the day before inventory.

(Garmon Aff. Ex. E.) Garmon signed this document without a response. (Garmon Aff. Ex. E.)

In an October 8, 2006, counseling document, identified as a verbal consultation, Nelson complained that Garmon had not answered multiple calls to, and voice mails left on, his phone or pager from Nelson or Store 129 associates after Garmon's work hours. Nelson reminded Garmon that he had been provided a pager so he could be reached when he was not in the store and "it is his responsibility to return pages and phone calls to the store & area manager." (Garmon Aff. Ex. F.) Garmon did not receive or sign the document, evidently because it was merely in support of a verbal consultation. (Garmon Aff. ¶ 23; Ex. F. )

The following year, Nelson issued another consultation document when Garmon left Store 129 at 11:00 the morning of Tuesday, February 6, 2007, to attend a mandatory meeting scheduled at noon, but failed to appear at the noon meeting or meetings scheduled at 1:30 and 3:00 that day, and did not respond to phone calls or pages. (Garmon Aff. Ex. G.) When questioned the following day, Garmon represented that he had stopped at home on the way to the meeting and had fallen asleep. (Garmon Aff. Ex. G.) Nelson advised Garmon in writing that:

> Attendance at meetings is mandatory. If a manager will not be in their store, for sickness or any other reason, during their normally scheduled work-time (6 A → 2 P, M → F) they must notify the Area Manager. Justin will respond to all phone calls and pages from his employees and supervisors.

(Garmon Aff. Ex. G.) Nelson underlined the sentence "[F]ailure to improve may result in disciplinary action or may result in termination of employment" found on the counseling form. (Garmon Aff. Ex. G.) Again, Garmon did not receive or sign the document evidencing a verbal consultation. (Garmon Aff. ¶ 25; Ex. G.)

Sometime during 2009, Bahram Sheed, Plaid's district manager in charge of the district encompassing Store 129 ("Sheed"), and Karen Anderson, Plaid's training manager ("Anderson"), informed Garmon that anytime an associate working alone in a store needed to take a break, the associate was authorized to lock the door and display a sign stating that would return shortly. (Garmon Aff. ¶ 27; Nelson Dep. 6:19-24; Hale Dep. 10:18-19.) Nelson confirmed this policy and Garmon trained all of his associates at Store 129 on the policy. (Garmon Aff. ¶ 27.)

In an annual Store Manager Performance Review dated July 19, 2009, Nelson rated Garmon at a "5" (superior), "4" (exceeds standard), or "3" (meets standard) in all sixty areas assessed with the exception of providing training to new hires; maintaining adequate staffing while using labor

dollars in correspondence to sales; handling spoilage, shortages, returns, and black-lines promptly; keeping salary and wages within budget; and maintaining cash control, for which Garmon received a "2" (below standard), and financial performance and bottom line, for which Garmon received a "1" (unacceptable). (Sherman Decl. Ex. 6.) Overall, Garmon received a rating of "3.48". (Sherman Decl. Ex. 6.) Nelson praised Garmon for improvements in controlling loitering, cash control, communication with other managers, inventory control, and covering the store during staffing shortages. (Sherman Decl. Ex. 6 at 6.) However, Nelson identified spending the required time in the store on a weekly basis, scheduling of double coverage to better match customer flow, accurate counting of cigarettes, and maintaining a clean and merchandised store as areas needing improvement. (Sherman Decl. Ex. 6 at 6.) Nelson specified that Garmon, as a store manager, needed to be in the store between 6:00 a.m. and 3:00 p.m. Monday through Friday at a minimum. (Sherman Decl. Ex. 6 at 6.) All of Nelson's store managers knew that they were expected to work from 6:00 to 3:00 and put in a minimum of 45 hours a week as exempt, salaried employees. (Nelson Dep. 39:20-22, 42:10-13.) Nelson was not aware, however, of any written policies that required store managers to work between 6:00 a.m. and 3:00 p.m. (Nelson Dep. 105:11-20.)

Garmon expressed confusion over his required work hours, stating that Nelson was not consistent with regard to Garmon's work hours. (Garmon Aff. ¶ 28.) Nelson initially told Garmon he was expected to work from 6:00 a.m. to 2:00 p.m., but then later expected Garmon to work from 6:00 a.m. to 3:00 p.m.; that Nelson expected Garmon to attend monthly meetings that began as early as 12:00 p.m.; and that Nelson told Garmon he could leave work early on freight days but that he could only leave after freight was completed. (Garmon Aff. ¶ 28.)

Garmon again failed to attend a mandatory meeting scheduled at 1:00 p.m. on November 10,

2009, despite informing Nelson by phone that he had left Store 129 at noon and was getting a ride to the meeting from a friend. (Garmon Aff. Ex. H at 1.) Garmon again failed to respond to phone calls and messages from Nelson. (Garmon Aff. Ex. H at 1.) Garmon signed the written consultation document and indicated that his car was in the shop. (Garmon Aff. Ex. H at 1.)

By June 8, 2010, Garmon missed more mandatory meetings and thus received a final written consultation from Nelson. (Garmon Aff. Ex. J.) When Nelson called to ask if Garmon would attend a 1:00 meeting, Garmon explained that he was at Store 129 putting away freight but that he would attend the 2:00 meeting. (Garmon Aff. Ex. J.) Garmon did not make the second meeting and did not call Nelson with a reason for his absence. (Garmon Aff. Ex. J.) Nelson noted that Garmon had received a written consultation for missing a meeting within the last year. (Garmon Aff. Ex. J) Garmon signed the document indicating that he had lost track of time and stayed at Store 129 to finish freight. (Garmon Aff. Ex. J.)

Garmon's 2010 Store Manager Performance Review showed a slightly improved overall rating of "3.53". (Sherman Decl. Ex. 7 at 5.) Garmon received a "5", "4", or "3" in all areas except the timely submission of personnel-related paperwork; ability to develop loyalty and professional work relationships; responsibility for daily cash management and audits; and coffee and fountain revenues, for which he received "2" ratings, and overall sales performance, and salaries and wages in proportion to budget, for which he received "1" ratings. (Sherman Decl. Ex. 7.) Nelson was pleased with Garmon's ability to delegate tasks and responsibilities to his staff, to control cash and inventory on an annual basis, and to use buy-ins to improve GP%. (Sherman Decl. Ex. 7 at 5.) On the negative side, among other things, Garmon was not spending the required time in the store on a daily and weekly basis or following the proper procedure to request time off/out of the store and

was not scheduling double coverage to match customer flow. (Sherman Decl. Ex. 7 at 6.). Garmon was again advised that a store manager must be in the store between 6:00 a.m. and 3:00 p.m. Monday through Friday at a minimum and reminded he needed to communicate ahead of time regarding scheduling. (Sherman Decl. Ex. 7 at 6.)

On December 29, 2010, Garmon received counseling for failure to be in Store 129 during his required working hours – 6:00 a.m. through 3:00 p.m. Monday through Friday. (Sherman Decl. Ex. 8.) In the written document supporting the counseling, which was designated as a "Final Written Consultation," Nelson indicated the reason for counseling was that:

> on 12/27/10 (approx 12:15 pm) & (12/28/10 approx 11:00 [a]m[2]) Store #129 was locked so the assistant manager could take a break. Justin (manager) was not in the store. Managers are required to be in the stores from 6 am → 3 pm and provide overlap in order for other associates working to take BOLI required breaks. The store may only be locked for 3rd shift break after 3 am, or in emergencies. Justin did not notify any supervisors that he would not be in his store during the required time.

(Sherman Decl. Ex. 8.) Nelson indicated that:

> [i]t is Justin's responsibility to write the schedule to provide mandatory breaks & to insure that they are taken at proper times. Double coverage is to be used during high customer travel times (ie. lunch rush, middle of swing shift) and to allow for breaks. Justin must notify his supervisor any time that he will not be in the store during his required shifts. Justin will write on his weekly labor analysis the time that he was at the store and the time he provided breaks to associates.

(Sherman Decl. Ex. 8.) Garmon noted on the document that "video has not been watched per [Nelson] to verify this claim" and "have been running same schedule for months now. Breaks like this are taken by all employees throughout the day and are unpredictable" and then signed it on December 29, 2010. (Sherman Decl. Ex. 8.)

---

[2]The court notes that while Nelson indicated it was 11:00 p.m., based on Garmon's work hours and the remainder of the documentation, it is likely that Nelson intended to refer to 11:00 a.m.

On July 20, 2011, Garmon informed Nelson in person at Store 129 that he had enlarged tonsils which needed to be removed. (Nelson Dep. 90:1-12.) Nelson then advised Sheed that Garmon was scheduled for tonsil surgery and would be off work for a period of time the following month, and that Stephen Kimbrough, the assistant store manager of Store 129 ("Kimbrough"), would cover while Garmon was on medical leave. (Sheed Dep. 12:11-13:20; Anderson Depo. 50:13-21.) When Garmon later expressed concern that about finding someone to cover Store 129 during a week when both Garmon and Kimbrough were scheduled to be out, Nelson told Garmon he would figure it out. (Nelson 87:5-13, 88:24-89:1.)

In a document dated July 21, 2011, Garmon requested medical leave starting on Tuesday, August 16, 2011, and continuing to Tuesday, September 6, 2011, for his tonsillectomy and required recovery time. (Garmon Dep. 76:22-77:10; Sherman Decl. Ex. 10.) Garmon placed the document in Nelson's drawer and advised Nelson that he had done so on July 22, 2011. (Garmon Dep. 41:23-25.) A few days later, Garmon removed the document from Nelson's drawer and put it in the courier bag because he was concerned Nelson would not get it to the corporate office. (Garmon Dep. 44:4-8.) There is no dispute that the corporate office eventually received Garmon's request for medical leave and that the request was approved.

In the last Store Manager Performance Review prepared by Nelson for Garmon, dated July 23, 2011, after Garmon had requested medical leave but before he took medical leave, Nelson rated Garmon with a "5", "4", or "3" in all areas except setting an example of extraordinary customer service; ensuring all personnel related paperwork is submitted to the area manager in a timely manner; and overall financial sales performance, on which he rated Garmon with a "2" (below standard), and coffee and fountain revenue percentage, on which he rated Garmon with a "1"

(unacceptable) (Sherman Decl. Ex. 9.) Garmon received an overall score of "3.62", which was lower than Nelson gave to other store managers during the same period. (Sherman Decl. Ex. 9 at 5; Nelson Dep. 33:6-13.) As in 2010, Nelson was pleased with Garmon's ability to delegate tasks and responsibilities to his staff, to control cash and inventory on an annual basis, and to use buy-ins to improve GP%. (Sherman Decl. Ex. 9 at 5.) Unlike prior years, Nelson did not indicate concern over Garmon's presence at Store 129 during required store manager hours. However, he did express concern about the scheduling of double coverage to match customer flow, the timeliness of reviews, the leadership and communication within the store, and the attitude Garmon displayed while at work. (Sherman Decl. Ex. 9 at 6.) Nelson further described the "attitude" as being confrontational or unhappy in front of customers and other employees, flippant about completing his job duties around Nelson, and abrasive toward Sheed. (Nelson Dep. 23:24-24:5, 25:7-16, 27:4-16.) During a meeting to discuss the evaluation, Nelson and Garmon discussed Garmon's concerns about the chronic lateness of store associate Michael Burnham ("Burhman"), Garmon's upcoming surgery, and Garmon's medical issues. (Garmon Aff. ¶ 48.)

Rostarmirad considered a "3.62"" a good performance evaluation. (Rostarmirad 19:2-7.) In fact, Nelson gave Garmon a raise because he also felt that Garmon was doing some good things. (Nelson 36:3-5; Garmon Aff. Ex. S.) About this time, Garmon asked Sheed, while Sheed was visiting Store 129, whether he could be allowed to leave earlier and work less hours, in lieu of a raise. (Sheed Dep. 14:9-24.) Garmon indicated that he was bored, that he could accomplish most of his tasks by delegating, and that he had a cell phone for emergencies. (Sheed Dep. 15:2-5.) Sheed told Garmon that he would "absolutely not" authorize Garmon to leave early and was shocked that Garmon had made the request. (Sheed Dep. 15:23-16:3.)

On Friday, August 5, 2011, Garmon left Store 129 at 2:00 in the afternoon. (Garmon Dep. 49:13-15.) He told Burnham, the associate working the swing shift at Store 129, that he was going to get something to eat but not whether he was going to return to work the rest of his shift or that he was sick. (Garmon Dep. 49:16-50:13.) Garmon never called Burnham to let him know he was not coming back to the store. (Garmon Dep. 50:23-51:1.) While Garmon advised Nelson he was not feeling well that morning, he did not tell Nelson he would be leaving early at that time or later call to inform Nelson he was leaving the store early because he was sick. (Garmon Dep. 53:8-11, 18-21; Nelson Dep. 101:21-102:6.) When Burnham was not able to contact Garmon to open the store safe, Burnham called Nelson for assistance. (Nelson Dep. 96:2-14.) At that time, Burnham informed Nelson that Garmon told him he would return after getting something to eat but had not, that he had tried to get a hold of Garmon, and that Garmon had not yet responded to his calls. (Nelson Dep. 96:16-22.) Garmon did not remember calling Burnham the evening of August 5th but did remember receiving a phone call from Store 129 that evening and telling Burnham to get quarters from the pub next door. (Garmon Aff. ¶ 49.)

On Wednesday, August 10, 2011, Nelson and Sheed visited Store 129 together to discuss Garmon's failure to work his entire shift the previous Friday. (Garmon Dep. 56:12-57:1.) When Nelson asked Garmon why he had left work early on August 5, 2011, Garmon explained that he left to get something to eat, drove to the north end of Wilsonville, and decided not to return to work. (Nelson Dep. 104:19-105:3.) He did not tell Nelson he left because he was sick. (Nelson Dep. 105:4-5.)

Nelson proposed, and Sheed agreed, to demote Garmon from store manager to assistant manager based on his continuing failure to be in Store 129 during the required store manager hours.

(Nelson Dep. 80:7-11, 80:20-81:11; Sheed Dep. 33:8-10.) The counseling document prepared by Nelson on August 10, 2011, supporting the demotion, explained that:

> on 8/5/11 Justin left Store #129 at 2:08 p.m., managers are required to be in their stores until 3:00 pm. Justin has been reminded/reviewed/counseled multiple times regarding this. Michael B. was working the afternoon shift from ~ 2 pm → 12 midnight. Justin was required to provide Michael with a ten minute break at 2:50 pm. Michael did not receive this break, in violation of labor agreements.

Nelson then indicated that: "Justin is demoted from store manager to a position of assistant manager, and will be transferred to another store." (Sherman Decl. Ex. 11.)

Nelson testified at his deposition that Garmon was demoted because he "was not in the store at the time I would have expected him to be, he did not contact me before leaving, and he was not in the store to provide Michael Burnham his scheduled break." (Nelson Dep. 92:22-93:4.) He had previously expressed his dissatisfaction with Garmon's repeated failure to be in the store during his required hours numerous times, both in person and in writing. (Nelson Dep. 112:15-24.) Based on the number of discussions Nelson had with Garmon about this issue in the past, Nelson felt it was appropriate to demote, rather than just suspend, Garmon. (Nelson Dep. 124:2-5; Sheed Dep. 27:25-28:9.) Garmon stated that he was never given the reason for his demotion, only that, "This is what we are doing." (Garmon Dep. 58:4-8.)[3]

Nelson decided to transfer Garmon from Store 129 to Store 19 effective Friday, August 12, 2011. (Nelson Dep. 53:25-54:2; Garmon Aff. Ex. W.) Garmon represented to Nelson and Sheed that he did not have a "very healthy working relationship" with Linda Lorenz, the store manager of

---

[3]Sheed subsequently disciplined Nelson in writing for failing to properly document Garmon's deficiencies with regard to not being in Store 129 when scheduled, leaving Store 129 early, and not contacting Nelson when he was not going to be in Store 129. (Nelson Dep. 109:7-23.)

Store 19 ("Lorenz")[4]. (Garmon Dep. 61:22-62:4.) However, Garmon expected that when he returned from medical leave, he would work things out with Lorenz. (Garmon Dep. 77:7-13.) Garmon worked at Store 129 on Thursday, August 11, 2011, and Friday, August 12, 2011. (Garmon Dep. 68:17-25; Nelson 53:20-22.) The following Monday, Garmon worked one three-hour shift at Store 19 before starting his medical leave on Tuesday, August 16, 2011. (Garmon Dep. 69:1-6.)

Garmon called Plaid's chief executive officer, Chris Girard ("Girard") to report that he had been demoted in retaliation for applying for medical leave. (Garmon Aff. ¶ 55.) Girard expressed concern over Garmon's statement and asked him to call Anderson and Bahman Rostarmirad, Plaid's vice president of operations ("Rostarmirad"), to discuss the issue. (Garmon Aff. ¶ 55.) Garmon telephoned Anderson and Rostarmirad on Friday, August 12, 2011, and requested a meeting to discuss his demotion, again stating that he felt his demotion was in retaliation for applying for medical leave. (Garmon Dep. 71:24-72:5; Garmon Aff. ¶¶ 57, 59.) Anderson suggested scheduling a meeting with everyone involved after Garmon returned from his medical leave. (Garmon Dep. 72:6-13.) Garmon was advised before he left on medical leave that he was going to be meeting with Anderson, Sheed, and Rostarmirad the day he returned from his medical leave, which was Tuesday, September 6, 2011. (Garmon Dep. 75:20-23; Rostarmirad Dep. 11:10-11.) During this conversation, Garmon also informed Anderson that he was not comfortable working with Lorenz, that he did not have a very good working relationship with her, and that she often referred to him as the "bug." (Garmon Dep. 69:15-70:9.) Anderson told Garmon that she "would see what she could do." (Garmon Dep. 70:10-13.)

[4]"Lorenz" is spelled more than one way in the pleadings and documents filed by the parties. In the interest of clarity and consistently, the court will refer to her as "Lorenz".

Before the September 6, 2011, meeting, Anderson spoke with Nelson, Kimbrough, Burnham, and Paul Hammond ("Hammond"), another associate at Store 129, to discuss the circumstances surrounding Garmon's demotion. (Anderson Dep. 50:11-16, 52:2-3.) Nelson told Anderson he demoted Garmon because he had left Store 129 early and did not give his associate a break. (Anderson Dep. 51:2-11.) Anderson also reviewed the video of Store 129 to confirm that Garmon left the store shortly after Burnham arrived about 2:00 p.m., and determined that Garmon intentionally denied Burnham a break. (Anderson Dep. 61:16-62:3; 66:23-25.)

On September 6, 2011, Garmon attended, and tape recorded, the scheduled meeting with Anderson, Sheed, and Rostarmirad, which lasted just under one hour. (Garmon Decl. 77:25-78:3, 79:25-80:2.) In the meeting, Garmon again complained that he had been demoted because he had requested medical leave. (Rostarmirad Dep. 32:4-5.) Rostarmirad stated that Garmon's request for medical leave had nothing to do with his demotion, he was demoted because he left work early, did not give his associate a break, and did not answer or respond to phone calls, and because this had occurred on prior occasions as well. (Rostarmirad Dep. 32:4-14.)

Later that day, Sheed advised Garmon by phone that he was being transferred to the Glencoe Road Store ("Store 210"), which was closer to where Garmon lived. (Garmon Dep. 83:5-12, 84:6-8; Garmon Aff. ¶ 68.) Sheed told Garmon that he would work in the position of assistant manager at the pay scale he was receiving prior to his medical leave, he would be reviewed again in ninety days, and if his performance and review were good, he would be restored to a store manager position when one was available. (Sheed Dep. 53:20-54:1; Garmon Dep. 81:8-22; Garmon Aff. ¶ 68; Garmon Aff. Ex. Z.) Garmon testified that he did not know the store manager of Store 210 and did not specifically request the transfer to Store 210, but also did not express any concerns being transferred

to Store 210. (Garmon Dep. 83:10-84:12.) Rostarmirad stated that Sheed transferred Garmon to Store 210 in response to a request by Garmon that he work on the other side of town, closer to his home. (Rostarmirad Dep. 29:3-9.)

On September 8, 2011, Javier Riega ("Riega") Plaid's area manager for the area covering Store 210, contacted Garmon to arrange a meeting the following day at Store 210. (Garmon Aff. ¶ 69.) Garmon met with Riega and temporary store manager Fernando Torres ("Torres") to discuss Garmon's position at Store 210. (Garmon Aff. ¶ 70.) The regular store manager of Store 210, Michael Hale ("Hale"), was then out on his own nine-week medical leave to recover from a heart attack. (Garmon Dep. 85:9-17, 87:9-15.) Garmon informed Riega and Torres that Sheed wanted him to work as an assistant manager for ninety days, receive a review, and be promoted back to a store manager position if appropriate. (Garmon Aff. ¶ 70.) Garmon was concerned that Store 210 seemed to already have an assistant manager in Chris Work ("Work"). (Garmon Aff. ¶ 71.)

Garmon started working at Store 210 on Monday, September 12, 2011. (Garmon Dep. 85:4-5; Garmon Aff. ¶ 71.) Hale returned from his medical leave on September 26, 2011, and, at that time, asked Garmon what hours he would prefer to work, planning to give Garmon his preference as assistant manager. (Hale Dep. 12:9-16; 31:22-32:2.) Hale remembers Garmon indicating that he wanted to work only Saturdays and Sundays. (Hale Dep. 32:1-5.) Hale informed Riega of Garmon's request and accommodated him by scheduling him to work only on weekends at Riega's direction. (Hale Dep. 32:1-5; 33:16-24; 34:3-5.) This is the only reason Hale scheduled Garmon to work two days a week on the weekends. (Hale Dep. 69:3-9.)

Garmon stated in his affidavit that he told Hale he wanted to work full-time with two consecutive days off each week, and that he was generally scheduled to work weekends and a couple

of short shifts during the week. (Garmon Aff. ¶ 79.) At some point, Garmon also advised Hale that he was not able to work the graveyard shift because of his need for a consistent sleep schedule. (Garmon Dep. 95:23-4; 140:5-9.) Hale responded "Okay" and did not thereafter schedule Garmon to work the graveyard shift. (Garmon Dep. 95:25-96:3.) In fact, Garmon never worked a graveyard shift for Plaid. (Garmon Dep. 91:3-5.)

In a counseling document dated October 3, 2011, Riega complained that Garmon had not completed a cigarette count on the weekend, a task assigned to Store 210's assistant manager. (Garmon Decl. Ex. BB.) Garmon indicated on the document that he had completed the count and that the video would support this claim. (Garmon Decl. Ex. BB.) Subsequently, Riega confirmed that Garmon had, in fact, completed the cigarette count and both Riega and Hale advised Garmon that the counseling document would be destroyed. (Garmon Dep. 102:11-21.)

On January 1, 2012, Garmon and Hale discussed a counseling document in which Hale complained that while Garmon was talking to a friend at the end of the counter, he failed to assist a customer in a "manly manner". (Garmon Dep. 97:20-98:17; Sherman Decl. Ex.13.) Hale advised Garmon that he was not to have friends or relatives hanging around excessively. (Sherman Decl. Ex. 13.) Garmon signed the document but noted that the individual he was talking to was a customer. (Sherman Decl. Ex. 13.) Hale subsequently stated that he made a mistake in using the term "manly". (Hale Dep. 58:1-5.)

During his tenure at Store 210, Garmon frequently complained to Hale that he did not have coverage and was not able to take a break. (Garmon Dep. 106:21-107:4.) Both Reiga and Hale advised Garmon that, under those circumstances, he could take his break by locking the door and using the company-produced sign. (Garmon Dep. 107:5-11.) Garmon made the same complaint to

Anderson who reviewed the scheduling and asked Hale to overlap times to allow Garmon to take a break. (Anderson Dep. 37:10-17, 38:15-23.) Before the break schedule was revised to provide Garmon with break coverage, Garmon did use the sign to close the store while he took his break. (Garmon Dep. 107:12-19.) Garmon also expressed a desire to work full-time and when he asked Hale why he was not getting full-time hours, Hale indicated that he already had an assistant manager in Work. (Garmon Aff. ¶ 95.) Finally, Garmon complained to Hale that the ninety-day review had not yet occurred and asked when it was going to happen. (Garmon Dep. 103:20-25.) Hale responded that they, meaning upper management, did not know anything about a ninety-day review. (Garmon Dep. 104:1-11.) Garmon then attempted to contact Sheed about the review. (Garmon Dep. 104:12-16.) Sheed did not respond to Garmon's page. (Garmon Dep. 104:12-16.)

In early January 2012, Garmon sent four emails to Plaid management complaining about the mistaken cigarette count documentation, the lack of a ninety-day review, and the lack of coverage for breaks, and informing Plaid that he had forwarded a complaint to Oregon's Bureau of Labor and Industy ("BOLI"). (Garmon Aff. ¶ 103.) In response, Anderson arranged a January 12, 2012, meeting, in which she assured Garmon that he would be reviewed the following week. (Garmon Dep. 115:2-5.) During this meeting, Garmon advised Anderson that he was trying to start a business-writing software business, he was yet not generating any revenue from the business, and he was not planning on quitting his employment with Plaid. (Garmon Dep. 116:1-10.) Anderson asked Garmon what hours he wanted to work. (Anderson Dep. 87:25-88:5.) Garmon indicated that full-time would be okay but that the hours he was currently working were fine as well. (Anderson Dep. 87:25-88:2.) Garmon also again complained that he was regularly unable to take his first break and that Hale had moved his starting time from 6:00 a.m. to 5:00 a.m. in what Garmon thought was

a retaliatory response to his BOLI complaint. (Garmon Dep. 112:7-10: Garmon Aff. ¶ 105.) Despite assurances that the schedules would be changed to provide overlap, and the subsequent rescheduling of the graveyard shift to ensure that Garmon would have break coverage, Garmon remembered that was still unable to take a break due to scheduling issues at least once more. (Garmon Dep. 112:11-21; 113:10-114:9.)

Riega immediately adjusted Garmon's starting back to 6:00 a.m. in response to Garmon's complaint. (Garmon Aff. ¶ 106.) However, Garmon felt that Riega was very short with him, his manner was demeaning, and his tone very harsh. (Garmon Aff. ¶ 106.) Garmon told Riega that he thought he was being unfairly scrutinized and that his work environment was becoming hostile. (Garmon Aff. ¶ 106.) Additionally, shortly after the meeting on January 12, 2012, Hale asked Garmon, "Why don't you just quit?" (Garmon Dep. 118:2-5.) Garmon admits that Hale never said he wanted Garmon to quit because he had taken medical leave. (Garmon Dep. 125:9-12.)

On January 22, 2012, Garmon arrived at work not feeling well and vomiting. (Garmon Aff. ¶ 108.) Garmon called Hale to report his condition and was told to keep working. (Garmon Aff. ¶ 108.) The associate working the graveyard shift at Store 210 called Work, who promptly arrived at the store to relieve Garmon. (Garmon Aff. ¶ 108.)

Hale reviewed Garmon's performance as an assistant manager in a written evaluation dated January 23, 2012. (Sherman Decl. Ex. 14.) Garmon received scores of "3" (satisfactory), "4" (good), or "5" (excellent), on all general areas except dependability, which indicates an employee's ability to "complete tasks with minimum supervision" and "help meet scheduling requirements of the store," for which he received a "2". (Sherman Decl. Ex. 14.) Hale told Garmon that he received a low score in this area because he was not available to work any shifts. (Garmon Dep. 122:20-25).

Assistant managers were ordinarily expected to work full-time hours – four or five days a week generally. (Nelson Dep. 117:7-13.) Garmon disagreed he was not able to work the expected shifts, indicated he thought he had a lot of availability, and specifically asked for additional shifts. (Garmon Dep. 123:1-7.) Hale subsequently complied with Garmon's request for more shifts and increased Garmon's shifts to three or four a week. (Garmon Dep. 123:11-16.)

Hale did not rate Garmon in sixteen of the twenty-five areas related to assistant manager responsibilities, indicating that these areas were not applicable to Garmon. (Sherman Decl. Ex. 14 at 2-3.) Garmon was not performing assistant manager duties, in part, because Hale did not assign him those duties. (Hale Dep. 38:6-10.) Hale did let Garmon order supplies once but then took that task away from him when Garmon ordered too much of some items and the wrong items. (Hale Dep. 38:11-15, 40:8-15.) Hale indicated that Garmon "[d]oes palm close & cash on weekends, handles money and coins accurately, counts cigarettes on weekends." (Sherman Decl. Ex. 14 at 3.) In discussing areas in which Garmon needed improvement, Hale wrote "working other shifts when needed, not working on store time on personal computer, must stock more on overlap and during working hours, keep an eye on outdated products, pull & write up for return." (Sherman Decl. Ex. 14 at 3.) After correcting a calculation error, Garmon received an overall rating of "3.58". (Sherman Decl. Ex. 14 at 3.)

Sheed determined that Garmon's performance was not good enough to merit a promotion to store manager. (Sheed Dep. 54:19-24.) This decision was based primarily on the rating of a "2" for dependability and the fact that Garmon was not performing all of the duties of an assistant manager because he was not working all of the shifts required of an assistant manager due to other obligations. (Sheed Dep. 65:4-17.) Sheed was also aware of complaints from Riega about Garmon's

performance at Store 210. (Sheed Dep. 58:6-13.) Riega described Garmon as "lazy". (Sheed Dep. 58:14-15.) He told Sheed that Garmon asked for shifts but then either called in sick, indicating that he was not able to work because of appointments or just did not show up. (Sheed Dep. 58:14-21.) Hale eventually promoted another employee to assistant manager, replacing Garmon due to Garmon's refusal to work as scheduled. (Hale Dep. 27:25-28:2.)

On February 6, 2012, Hale prepared counseling documents related to a shrinkage issue for Garmon and at least four other employees. (Garmon Dep. 130:20-131:10.) Garmon complained to Anderson by email on February 17, 2012, that he was the first to receive the document in front of all the other associates. (Garmon Dep. 130:7-24). No other employee complained about receiving the counseling document. (Garmon Dep. 131:11-132:7.)

On February 19, 2012, Hale mentioned to Garmon as he was leaving Store 210 that if the cigarette count comes up short, we "will have a problem young lady." (Garmon Aff. ¶ 116.) Shortly after that, Garmon began suffering from anxiety as a result of the way he was being treated at work. (Garmon Aff. ¶ 117.) On February 22, 2012, Garmon called Hale to let him know he was sick and that Brenda Olsen would cover his shift. (Garmon Aff. ¶ 117.) The next day, Garmon again called Hale and informed him he was having stomach cramps and was under a lost of stress. (Garmon Aff. ¶ 118.)

In response to receiving additional complaints from Garmon, Anderson scheduled another meeting for February 24, 2012. (Garmon Dep. 132:8-133:8.) On the evening of February 23, 2012, Garmon informed Anderson by email that he had been suffering from a cold and would not be able to attend the meeting scheduled the following day. (Garmon Dep. 133:21-133:7.) The short meeting eventually occurred on February 29, 2012, in the back room of Store 210 with Garmon, Anderson,

Sheed, Rostarmirad, Hale, and Riega all in attendance. (Garmon Dep. 136:17-137:2; Rostarmirad Dep. 38:12-24.) The primary reason for the meeting was to discuss Garmon's inability to work after 9:00 p.m. due to his sleep apnea. (Rostarmirad Dep. 39:14-19.) Garmon indicated that he had worked out the issue with Hale. (Rostarmirad Dep. 39:14-19, 40:13-18.)

Garmon was scheduled to work the swing shift at Store 210 on March 7, 2012. (Garmon Dep. 141:16-21.) Garmon did not show up for work that day and did not give Hale advance notice that he would not be available to work at all that day due to a medical appointment. (Garmon Dep. 141:6-9.)

The next day, Garmon appeared at Store 210 to advise Hale that he "would not be able to continue working for the company under hostile work environment conditions." (Garmon Dep. 143:23-144:1.) Garmon refused to give Hale two-weeks notice, stating that he had enough and that the meeting was what had pushed him over the edge. (Hale Dep. 78:13-19.) Garmon explained at his deposition that the "hostile work conditions" consisted of harassment and retaliation. (Garmon Dep. 144:9-15.) He stated that other Plaid employees gave him "attitude" and were "verbally short" with him, specifically Work. (Garmon Dep. 144:16-18, 146:4-6, 147:9-11.) Work would state that he thought he should be assistant manager, rather than Garmon, and speak to Garmon in an undermining demeanor. (Garmon Dep. 144:22-145:4.) Garmon does not remember complaining about his coworkers' attitude to anyone, including Anderson, Sheed, or Rostarmirad. (Garmon Dep. 146:8-20.) He also does not remember telling anyone at Store 210, other than Hale, that he had taken medical leave. (Garmon Dep. 147:18-148:2.)

*Legal Standard*

Summary judgment is appropriate where the "movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a) (2013). Summary judgment is not proper if material factual issues exist for trial. *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995).

The moving party has the burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Id.* at 324. A nonmoving party cannot defeat summary judgment by relying on the allegations in the complaint, or with unsupported conjecture or conclusory statements. *Hernandez v. Spacelabs Medical, Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003). Thus, summary judgment should be entered against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

The court must view the evidence in the light most favorable to the nonmoving party. *Bell v. Cameron Meadows Land Co.*, 669 F.2d 1278, 1284 (9th Cir. 1982). All reasonable doubt as to the existence of a genuine issue of fact should be resolved against the moving party. *Hector v. Wiens*, 533 F.2d 429, 432 (9th Cir. 1976). Where different ultimate inferences may be drawn, summary judgment is inappropriate. *Sankovich v. Life Ins. Co. of North America*, 638 F.2d 136, 140 (9th Cir. 1981).

However, deference to the nonmoving party has limits. A party asserting that a fact cannot be true or is genuinely disputed must support the assertion with admissible evidence. FED. R. CIV. P. 56(c) (2013). The "mere existence of a scintilla of evidence in support of the [party's] position [is] insufficient." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Therefore, where "the

record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotations marks omitted).

*Discussion*

I. First Claim for Relief - Violation of Federal Act

In his First Claim for Relief, Garmon alleges that Plaid violated the Federal Act by subjecting him to adverse employment actions in response to Garmon's applying for and taking medical leave protected by the Federal Act. Garmon specifically alleges that the adverse employment actions include "demoting Plaintiff, reducing his salary, reducing his hours, reassigning him to a different work location, disciplining him . . . , and failing to restore him to his store manager position." (Compl. ¶ 57.) In his memorandum in opposition to Plaid's motion for summary judgment, Garmon relied on these actions, as well as Plaid's failure to reinstate him "to the position he had when his leave commenced, delaying his return to work by a week." (Pl.'s Mem. in Opp'n to Def.'s Motion for Summ. J. at 20.)

The Federal Act allows qualified employees to use a specified amount of leave for protected reasons and ensures the employees will return to his or her job, or an equivalent job, upon returning from protected leave. 29 U.S.C. §§ 2612(a), 2614(a) (2012). An employee who sues his or her employer for violation these rights` may proceed under three distinct theories. An "interference" claim arises when an employer interferes with, restrains, or denies an employee the exercise of his or her rights under the Federal Act. 29 U.S.C. § 2615(a)(1) (2012). This cause of action includes situations where an employer takes an adverse employment action against an employee for requesting or taking protected leave. A "discrimination" claim, on the other hand, arises only when

an employer discharges or otherwise discriminates against an employee who opposes a practice made unlawful by the Federal Act. 29 U.S.C. § 2615(a)(2) (2012). Finally, a retaliation claim exists when an employer retaliates against an employee for initiating or participating in proceedings or inquiries under the Federal Act. 29 U.S.C. § 2615(b) (2012). Based on the allegations of the complaint and Garmon's arguments in response to Plaid's motion for summary judgment, it is clear that Garmon is asserting an interference claim.

To prove a *prima facie* case of interference under the Federal Act, Garmon must establish he took protected leave, was subjected to an adverse employment action, and a causal relationship between the taking of protected leave and the adverse employment action. *Price v. Multnomah County*, 132 F. Supp. 2d 1290, 1296 (D. Or. 2001). Stated more succinctly, a plaintiff must show that his taking of leave protected under the Federal Act was a negative factor in the decision to take an adverse employment action. *Bachelder v. America West Airlines, Inc.*, 259 F.3d 1112, 1125 (9th Cir. 2001). Where, as here, plaintiff's theory of liability is based on interference, the traditional *McDonnell-Douglas* burden-shifting analysis does not apply. *Bachelder*, 259 F.3d at 1125

It is undisputed that Garmon applied for and took protected leave. Accordingly, the first element of the *prima facie* case has been met. An employment action is deemed adverse when the action is reasonably likely to deter employees from engaging in protected activity. *Id.* at 1124. Among the employment actions that may constitute an adverse employment action under federal law depending on the circumstances are termination, dissemination of an unfavorable employment reference, issuance of an undeserved negative performance review, refusal to consider for promotion, exclusion from meetings, seminars and positions providing eligibility for salary increases, denial of secretarial support, a more burdensome work schedule, and a lateral transfer. *Ray v. Henderson*, 217

F.3d 1234, 1241 (9th Cir. 2000); *Brooks v. City of San Mateo*, 229 F.3d 917, 928 (9th Cir. 2000). However, under the context of the Federal Act, a plaintiff must additionally establish that he was economically prejudiced as a result of the employer's actions. *Benz v. West Linn Paper Co.*, 803 F. Supp. 2d 1231, 1249-50 (D. Or. 2011). Plaid's action in demoting Garmon, with a resulting decrease in salary, reducing his hours, and failing to restore him to his store manager position all resulted in economic prejudice to Garmon and are actionable adverse employment actions. However, reassigning Garmon to different locations and disciplining him, without a resulting decrease in salary, are not.

Nelson demoted Garmon to assistant manager, with a corresponding reduction in pay, on August 10, 2011. Nelson then transferred Garmon to Store 19, where he worked one short shift before taking medical leave. Sheed transferred Garmon to Store 210 upon his return from medical leave. Garmon's pay after both transfers was at the reduced rate established by Nelson in conjunction with the demotion from store manager to assistant manager. Accordingly, any reduction in pay was related solely to the demotion, not the transfers.

Judge Stewart recently held that a reassignment to a position characterized by the plaintiff as less desirable with fewer privileges, prerequisites, or status than the plaintiff's previous position, did not support a claim under the Federal Act where the plaintiff worked the same shift and had no change in his pay or benefits. *Benz*, 803 F. Supp. 2d at 1250. Judge Stewart noted that the plaintiff failed to present evidence to show how he was prejudiced, economically or otherwise, by the reassignments, and rejected the plaintiffs' subjective beliefs that he was prejudiced by the reassignments or that the new positions were less desirable that his original job. *Id.* Here, Garmon does not assert that the assistant manager positions at Store 19 or Store 210 were less desirable than

an assistant manager position at Store 129. The evidence clearly establishes that Garmon was paid the same wage at both stores. Accordingly, the court find that Garmon's transfers to the Store 19 and Store 210 do not constitute an adverse employment action.

Garmon has also failed to establish that he suffered any economic prejudice from disciplinary actions taken against him. To the extent the disciplinary actions resulted in Garmon's demotion and resulting decrease in pay, they are properly considered in conjunction with the demotion. Similarly, to the extent the disciplinary actions contributed to the hostile environment which allegedly resulted in Garmon's constructive discharge, they will be considered in support of Garmon's wrongful discharge claim. However, the disciplinary actions, standing alone, did not result in any economic prejudice to Garmon and are not actionable as an independent basis for Garmon's claim under the Federal Act.

In light of the fact that Garmon took leave protected under the Federal Act, and that the court has determined Garmon's demotion, resulting loss in pay, subsequent reductions in hours, and denial of a promotion, are adverse employment actions resulting in an economic deprivation to Garmon, the only question remaining is whether a causal relationship exists between Garmon's requesting and taking of medical leave and these actionable adverse employment actions.

Garmon first mentioned to Nelson that he would need to take extended medical leave for tonsil surgery on July 20, 2011. Prior to that, Nelson had documented his dissatisfaction with, among other things, Garmon's refusal to be in Store 129 during his required shift – 6:00 a.m. to at least 2:00 p.m. initially and then 3:00 p.m. from at least July 2009 – or advise Nelson that he would not be in Store 129 during those hours. On December 29, 2010, Nelson authored a counseling form, identified as a "Final Written Consultation" indicating that Garmon was not in Store 129 at 12:15

p.m. on 12/27/10 or at 11:00 a.m. on 12/28/10, noting that Garmon, as store manager, needed to be in Store 129 from 6:00 a.m. to 3:00 p.m., and directing Garmon to notify his supervisor anytime he would not be in Store 129 during those hours. Less than three weeks after requesting protected leave, Garmon left Store 129 at 2:00 p.m., did not advise Burnham he would not be returning, did not advise Nelson he was leaving Store 129 early, and did not answer, or respond, to phone calls from Burnham until that evening. Nelson and Sheed decided to demote Garmon to assistant manager, with a corresponding reduction in pay, as a result of Garmon's actions.

Garmon has failed to offer any direct evidence that his demotion and reduction in pay were related to his request for protected leave. Instead, Garmon relies on Nelson's knowledge that he requested protected leave and the temporal proximity between the request for leave and the demotion. In some cases, an inference of causation may be inferred solely from the proximity in time between the request for leave and the adverse employment action. *Liu v. Amway Corp.*, 347 F.3d 1125, 1137 (9th Cir. 2003). However, "an employer is not required to cease pursuing a disciplinary course of action against an employee that began before that employee took [Federal Act]-related leave, simply because that employee took leave." *Swan v. Bank of America*, 360 Fed. Appx. 903, 906 (9th Cir. 2009).

Nelson's documentation, in Garmon's performance reviews and counseling documents, the last of which was a "Final Written Consultation" advising Garmon that "failure to improve could result in disciplinary action," clearly establishes that Plaid had initiated a disciplinary course of action before Garmon requested medical leave, negating the inference of causal relationship between the protected leave and the demotion. The existence of the documented concerns supports a finding that the demotion was the result of Garmon's performance issues, and that his request for protected

leave was not a negative factor in the decision to demote him to assistant manager or reduce his pay accordingly. Additionally, the evidence establishes that Nelson gave Garmon a positive review and a pay raise after he requested protected leave but before he was demoted. This favorable treatment between Garmon's request for medical leave and his demotion contradicts Garmon's claim that Nelson intentionally retaliated against Garmon. *See Coghlan v. American Seafoods Co. LLC.*, 413 F.3d 1090, 1096-97 (9th Cir. 2005)(holding, in Title VII context, that strong inference of no discriminatory action exists where same individual is responsible for both favorable treatment of employee and subsequent adverse action). The court finds that Garmon is unable to create a genuine issue of fact that there was a causal relationship between his request for medical leave and demotion to assistant manager with a resulting decrease in pay.

Garmon alleges that while working at Store 210, Hale denied him the full-time hours generally associated with an assistant manager position. Plaid contends that Garmon was not working full-time hours either because he requested shorter hours or failed to work his scheduled hours. Garmon started working at Store 210 on September 12, 2011, nearly a week after returning from his protected leave. When Hale returned from his own protected leave approximately two weeks later, he scheduled Garmon to work only on weekends.

The proximity between Garmon's return from protected leave and the adverse employment action of scheduling reduced hours – only two weeks – is sufficient to infer a causal relationship. Plaid's offered justification for the reduced hours, that Garmon wanted to work minimal hours, is contradicted by Garmon's testimony that he told Hale he wanted to work full-time with two consecutive days off each week, and his subsequent requests to both Hale and Anderson that he be schedule to work full-time. Based on the temporal proximity of Garmon's protected leave and his

reduced hours, and the existence of a genuine issue of material fact with regard to whether the reduced hours were scheduled at the request of Garmon, the court finds that Garmon has raised a triable issue with regard to whether his taking protected leave was a negative factor in Hale's decision to schedule Garmon to work reduced hours. Accordingly, Garmon has stated a viable claim under the Federal Act based on his reduced hours while working at Store 210.

Finally, Garmon asserts that he was not returned to his former position as retaliation for his taking leave under the Federal Act. It is not entirely clear whether Garmon is arguing that he was not returned to his former position when he returned from leave or that he was not returned to his store manager position after working ninety days at Store 210.

The record establishes that when Garmon left on his protected leave, he was working as an assistant manager at the assistant manager pay scale. There is no dispute that when Garmon returned to work at Store 210, it was in the position of assistant manager at the same pay scale as before he left on medical leave. To the extent Garmon is arguing that he was not given the hours or responsibilities generally assigned to an assistant manager, those arguments are either properly addressed above (reduced hours) or below (responsibilities). The court finds when he returned from his protected leave, Garmon was placed in the same position and pay he enjoyed prior to his taking protected leave.

Finally, Garmon argues that his taking protected leave was a negative factor in Plaid's refusal to restore him to a store manager position after ninety days as an assistant manager. Sheed decided not to promote Garmon in late January 2012, more than four months after Garmon's protected leave. Viewing these two acts alone, the temporal proximity is not sufficient to justify the inference of a causal relationship from timing alone. *See Swan*, 360 Fed. Appx. at 906 ("BOA terminated Swan

four months after her return from leave, which is too remote in time to support a finding of causation based solely on temporal proximity.") However, Sheed based his decision on the performance review authored by Hale which, in Sheed's opinion, indicated that Garmon was not performing all of the duties of an assistant manager because he was not working all of the shifts required of an assistant manager.[5] Sheed also relied on the score of "2", or "needs improvement" in the area of dependability, which Hale gave because Garmon was not available to work shifts. Garmon disagreed with this assessment, indicating that he had a lot of availability and, again, specifically requesting additional shifts.

The court has found a genuine issue of material fact exists with regard to whether Garmon's protected leave was a negative factor in Hale's scheduling Garmon for reduced hours. To the extent Sheed's decision not to promote Garmon relied on the reduced hours and resulting inability to perform all of the duties required of an assistant manager, the same genuine issue of material fact exists with regard to Plaid's failure to restore Garmon to his store manager position. Garmon has presented evidence he requested and complained about reduced hours throughout his tenure at Store 210, thereby creating the temporal proximity required to infer the existence of a causal relationship. Accordingly, Garmon has offered evidence requiring consideration by a trier of fact with regard to factual issue of whether Garmon's protected leave was a negative factor in Plaid's failure to restore Garmon to his store manager position.

Plaid is entitled to summary judgment on Garmon's claims under the Federal Act with regard to his demotion and resulting reduction in pay, transfers to other Plaid stores, disciplinary actions,

---

[5] There is no evidence that any disciplinary action initiated against Garmon while he was working at Store 210 had any effect on Sheed's decision not to promote Garmon.

and assignment when he returned from his protected leave. Garmon has, however, presented evidence which establishes temporal proximity between his taking protected leave and Hale's failure to schedule Garmon for full-time hours and creates a genuine issue of material fact on the question of whether Garmon requested less that full-time hours. Consequently, Garmon has offered facts supporting a *prima facie* interference claim based on Hale's scheduling Garmon for reduced hours, and Sheed's refusal to restore Garmon to his store manager position, which was based primarily on Garmon's reduced hours and resulting failure to perform assistant manager duties. Accordingly, these issues must be presented to an ultimate trier of fact.

II. Second Claim for Relief – The Oregon Act

Garmon asserts a claim for relief under the Oregon Act based on the same retaliatory actions alleged in support of his claim under the Federal Act. Both the Oregon Court of Appeals and this court have held an employer may not retaliate against an employee who takes leave protected under the Oregon Act. *Rogers, v. Oregon Trail Elec. Consumers Co-Operative, Inc.*, No. 3:10-CV-1337-AC, 2012 WL 1635127, at *20 (D. Or. May 8, 2012); *Yeager v. Providence Health Sys. of Or.*, 195 Or. App. 134, 139 (2004). The Oregon Act specifically provides that, whenever possible, provisions of the Oregon Act are to be construed in a manner that is consistent with similar provisions of Federal Act. OR. REV. STAT. § 659A.186(2). Accordingly, the analysis applied to the claims brought under the Federal Act apply equally to Garmon's claims asserted under the Oregon Act. Garmon has asserted a viable claim for relief under the Oregon Act based on the reduction of his hours while working at Store 210 and the decision not to promote Garmon to store manager, which was based on Garmon's failure to work the hours required of an assistant manager and corresponding inability to perform all of the duties required of an assistant manager.

III. Third Claim for Relief – Whistleblower Statute

In his Third Claim for Relief, Garmon alleges that Plaid retaliated against him in response to his reporting a violation of a state or federal law. In support of this claim, Garmon relies on his reports to Plaid management of alleged retaliatory conduct relating to Garmon's requesting and taking protected leave, which occurred in August and September, 2011, January, 2012, and possibly February 2012. Plaid moves for summary judgment on this claim, arguing that Garmon's demotion occurred before he reported the retaliatory conduct, and that Garmon's complaints with regard to missed breaks and his late performance review were promptly addressed by management.

The Whistleblower Statute makes it unlawful for a private employer to "discriminate or retaliate against an employee . . . for the reason that the employee has in good faith reported information that the employee believes is evidence of a violation of a state or federal law, rule, or regulation." OR. REV. STAT. 659A.199 (2011). To establish a *prima facie* case of retaliation under the Whistleblower Statute, a plaintiff must prove virtually the same three elements required under the Federal Act: 1) he engaged in a protected activity; 2) he suffered an adverse employment action; and 3) a causal link between the protected activity and adverse action. While Garmon argues to the contrary, it is clear that this court has consistently held that a burden-shifting analysis applies to actions for violation of the Whistleblower Statute. *Gillis v. Wal-Mart Stores Inc.*, No. 03:11-cv-01520-HZ, 2013 WL 1623925, at *13 (D. Or. April 15, 2013)("Because recent decisions within this district have repeatedly applied the *McDonnell Douglas* burden-shifting analysis to whistleblowing claims under ORS 659A.199 and 659A.230 and because Gillis points to no binding authority stating otherwise, I conclude that the *McDonnell Douglas* burden-shifting applies.")(citing *Larmanger v. Kaiser Found. Health Plan*, 895 F. Supp. 2d 1033, 1049 (2012); *Neighorn v. Quest Health Care*,

870 F. Supp. 2d 1069, 1102 (D. Or. 2012); *Merrill v. M.I.T.C.H. Charter School Tigard*, Civil No. 10-219-HA, 2011 WL 1457461, at *7 (D. Or. April 4, 2011)). Accordingly, if the plaintiff is able to establish a *prima facie* case, the employer is given an opportunity to assert a non-retaliatory justification for the adverse action, which the plaintiff may then rebut by showing that the employer would not have taken the adverse action absent a retaliatory motive. *Peters v. Betaseed, Inc.*, No. 6:11-CV-06308-AA, 2012 WL 5503617, at *3 (D. Or. Nov. 9, 2012)

Plaid appears to concede that Garmon engaged in protected activity by reporting that he was demoted in retaliation for requesting and taking medical leave. The employment actions relied on by Garmon in support of his Whistleblower Statute claim – a demotion with a resulting decrease in salary, lateral transfers with a denial of benefits, and a failure to promote to store manager as promised – all actions likely to deter an employee from reporting perceived violations of a state or federal law and constitute adverse employments actions under *Ray* in the absence of the economic prejudice requirement unique to claims under the Federal Act. The question then is whether Garmon has established a causal link between his whistleblowing activity and the adverse employment actions.

The evidence clearly establishes that on August 10, 2011, Nelson and Sheed made the decision to demote Garmon to assistant manager and transfer him to another store. Garmon first reported conduct he believed to be a violation of state or federal law the next day, when he contacted Girard to complain that he had been demoted in retaliation for applying for medical leave. Consequently, neither the demotion or the transfer to Store 19 are adverse employment actions taken in response to Garmon's first report of unlawful conduct, which occurred a day later. The causal link does exist with regard to Garmon's transfer to Store 210 and resulting decrease in benefits, as well

as Sheed's decision not to promote Garmon because of his failure to work assistant manager hours or perform assistant manager duties. Therefore, Garmon has established a *prima facie* case under the Whistleblower Statute and the court must move to the burden-shifting analysis.

Plaid asserts that it transferred Garmon from Store 19 to Store 210 in response to Garmon's representation that he did not get along with Lorenz, the store manager of Store 19, and his request to be transferred to a store closer to his residence. Garmon admits that he complained about his working relationship with Lorenz to Nelson, Sheed, and Anderson, but felt that he would work things out with her when he returned from medical leave. He states that he never specifically requested the transfer for any reason but also admits that he did not express any concerns about the transfer. The fact that Garmon did not specifically request a transfer does not adequately rebut the evidence that he complained about working with Lorenz or expressed a desire to work closer to home and that Plaid transferred him to Store 210 to accommodate, rather than punish, him. Plaid's non-retaliatory reason for transferring Garmon from Store 19 to 210 defeats Garmon's claim under the Whistleblower Statute with regard to this transfer.

Once Garmon started working at Store 210, he was scheduled for part-time rather than full-time hours and, as a result, was unable to accomplish all of his assistant manager duties. Plaid represents that Garmon was scheduled for part-time hours at his request and that as soon as he complained about his hours, his scheduled hours increased. Garmon has presented evidence that he requested full-time hours during his initial conversation with Hale and at least on two other occasions but despite these requests he was scheduled to work weekends with only occasional short shifts during the week. The court finds that Garmon has adequately rebutted Plaid's non-retaliatory reason for Garmon's part-time schedule. Because Sheed's decision to not promote Garmon to a store

manager position was primarily based on Garmon's part-time hours and resulting inability to perform assistant manager duties, Plaid's non-retaliatory reason for failing to return Garmon to a store manager position has also been rebutted.

The court concludes that a reasonable trier of fact could find that Plaid scheduled Garmon for less than the full-time hours normally given an assistant manager and refused to restore him to a store manager position in response to his reporting that he was retaliated against for taking medical leave in violation of the Whistleblower Statute. Accordingly, Garmon has supported his claim under the Whistleblower Statute based on these alleged retaliatory acts and is entitled to proceed on this claim. Plaid is, however, entitled to summary judgment on Garmon's Third Claim for Relief with regard to Garmon's demotion and lateral transfers.

IV. Fourth Claim for Relief – Wrongful Discharge

Garmon alleges that he was forced to resign his employment with Plaid as a result of hostile work conditions intentionally created by Plaid to retaliate against Garmon for taking leave protected under the Federal Act and the State Act, and for reporting violations of state and federal laws. Generally, absent a contractual, statutory or constitutional requirement, an employer may discharge an employee at any time and for any reason without creating a tortious cause of action. *Patton v. J.C. Penney Co.*, 301 Or. 117, 120 (1986), *abrogated on other grounds by McGanty v. Staudenraus*, 321 Or. 532 (1995). In 1975, the Oregon Supreme Court first recognized the tort of wrongful discharge in *Nees v. Hocks*, 272 Or. 210, 218 (1975), which the court "established to serve as a narrow exception to the at-will employment doctrine in certain limited circumstances where the courts have determined that the reasons for the discharge are so contrary to public policy that a remedy is necessary in order to deter such conduct." *Draper v. Astoria School Dist. No. 1C*, 995 F. Supp.

1122, 1129 (D. Or. 1998), *abrogated on other grounds by Rabkin v. Oregon Health Sciences University*, 350 F.3d 967 (9th Cir. 2003). The Oregon courts continue to recognize that the tort of wrongful discharge is a narrow exception to the general rule of at-will employment. *Babick v. Oregon Arena Corp.*, 160 Or. App. 140, 143 (1999), *rev'd on other grounds*, *Babick v. Oregon Arena Crop.*, 333 Or. 401, 407 (2002).

"The elements of a wrongful discharge claim are simple: there must be a discharge, and that discharge must be 'wrongful.'" *Moustachetti v. Oregon*, 319 Or. 319, 325 (1994). A discharge is considered "wrongful" under only two scenarios: (1) when the employee is discharged for fulfilling an important public or societal obligation, or (2) when the employee is discharged for exercising an employment-related right of important public interest. *Lamson v. Crater Lake Motors, Inc.*, 346 Or. 628, 636 (2009)(citing *Delaney v. Taco Time Intern., Inc.*, 297 Or. 10, 15-16 (1984)). This element inherently contains a requirement that the plaintiff also establish a causal connection between the discharge and the exercise of her employment related right. *Estes v. Lewis and Clark* College, 152 Or. App. 372, 381 (1998)(citing *Shockey v. City of Portland*, 313 Or. 414, 422-23 (1992)). "Invoking rights to benefits under [the Federal Ac]t and [State Act] is an employment-related right that may serve as the basis for a wrongful discharge claim. *Lawson v. Walgreen Co.*, No. CV. 07-1884-AC, 2009 WL 742680, at *12 (D. Or. March 20, 2009).

The discharge element can be established by providing evidence of either (1) a unilateral decision by the employer to discharge the employee, or (2) a constructive discharge. *Sheets v. Knight,* 308 Or. 220, 227-28 (1989), *abrograted on other grounds by McGanty v. Staudenraus*, 321 Or. 532, 555-57 (1995). Under Oregon law, a constructive discharge occurs either when an employee is told to resign or be fired or when an employee resigns as a result of intentionally created

unacceptable or intolerable working conditions. *Sheets*, 308 Or. at 227-8; *McGanty*, 321 Or. at 557-58.

To establish a claim of constructive discharge stemming from unacceptable working conditions under Oregon law, a plaintiff must prove:

> (1) that the employer intentionally created or intentionally maintained specified working condition(s); (2) those working conditions were so intolerable that a reasonable person in the employee's position would have resigned because of them; (3) the employer desired to cause the employee to leave employment as a result of those working conditions or knew that the employee was certain or substantially certain, to leave employment as a result of those working conditions; and (4) the employee did leave the employment as a result of those working conditions.

*McGanty*, 321 Or. at 556-57. To show constructive discharge, a plaintiff must at least show some "aggravating factors", such as a "continuous pattern of discriminatory treatment." *Thomas v. Douglas*, 877 F.2d 1428, 1434 (9th Cir 1989) (citations omitted).. Personal discomfort is not enough to sustain an action for constructive discharge. *Id.* The determination of whether conditions are "so intolerable and discriminatory as to justify a reasonable employee's decision to resign is normally a factual question left to the trier of fact." *Id.*

In his deposition, Garmon specifically stated that the intolerable working conditions which forced him to quit on March 8, 2012, were the "attitude" that he was getting from other associates at Store 210 , particularly from Work, who talked to Garmon in an "undermining demeanor" and indicated he thought he should be assistant manager rather than Garmon. He did not describe any other intolerable conduct that factored into his decision to resign. Garmon did not tell any of the associates he had taken medical leave; there is no evidence the associates knew of Garmon's medical leave or his reports of violations of federal or state law, and he never complained to Plaid management about the associates behavior. Based on the evidence before the court, Garmon is

unable to prove that the work environment created by the associates, which is limited to Work's undermining demeanor and other associates' "verbally short" treatment of Garmon, was so intolerable that a reasonable person would feel forced to resign. Additionally, in the absence of any evidence that the associates were aware of Garmon's taking medical leave or reporting violations of federal or state laws, Garmon has failed to establish a causal relationship between the associates's poor treatment of him and his exercise of an employment-related right.

Garmon argues in his opposition brief that the numerous disciplinary actions relating his missing work and his demotion, as well as Hale's subsequent treatment of him while at Store 210, also contributed to the hostile working conditions. Even assuming that Garmon is entitled to rely on this conduct as a reason for his quitting, which is not necessarily supported by his deposition testimony, he has not established a viable claim for wrongful discharge.

First, the demotion and discipline for missing work occurred before Garmon requested protected leave or reported violations of state and federal law to Plaid management or BOLI. Accordingly, there is no evidence that the conduct was causally related to the exercise of his rights.

Second, while Hale may have scheduled Garmon for less than full-time hours, deprived Garmon of coverage for breaks, issued unwarranted discipline, and delayed his performance review, the evidence establishes that every time Garmon complained to management about Hale's conduct, the complaints were remedied. When Garmon complained about the counseling document based on his failure to complete a cigarette count, Riega and Hale advised Garmon that the document would be destroyed and he would not be disciplined. When Garmon complained to Hale and Anderson about his hours, he was scheduled to work additional hours. When Garmon complained to Anderson, Hale, and Reiga about not being able to take breaks, schedules were adjusted and

Garmon was advised that he could place a sign provided by Plaid in the door and close Store 210 while he took his break. The evidence establishes that Garmon did take breaks by closing Store 210 and could remember only one time after he complained and schedules were revised that he had to do so. When Garmon complained about his delayed performance review, he received one ten days later. This evidence prevents Garmon from establishing that Plaid intentionally created or maintained hostile working conditions or that Plaid wanted to cause Garmon to quit by continuing to subject him to behavior to which he objected.

Finally, the evidence establishes that despite Garmon's complaints, he was generally happy with his job at Store 210 and did not have any plans to leave at least as late as January 12, 2012. In a meeting held that date, Garmon told Anderson that he was not planning to quit and that while he would like to work full time, he was fine with his current hours as well. In fact, Garmon stated in his affidavit that he did not start suffering from anxiety as a result of the way he was being treated until February 19, 2012, after the majority of Garmon's complaints had been resolved. The only conduct which supports Garmon's claim that his working conditions became unbearable after the January 12, 2012, meeting is Hale asking Garmon why he did not just quit, his reference to Garman as "young lady", his asking Garmon to continue to work when he was not feeling well, his writing Garmon up, along with four other employees, for shrinkage issues, and his replacing Garmon with Work as assistant manager; the issuance of Garmon's performance review and subsequent denial of his promotion; and Reiga treating Garmon in a short, harsh, and demeaning manner. This conduct does not contain the aggravating factors necessary to constitute intolerable conduct sufficient to support a constructive discharge claims. The conduct occurred over six-to-seven week period, consists primarily of ordinary management decisions and conduct, and does not amount to a

continuous pattern of discriminatory treatment that would cause a reasonable person to quit. *See Tomco v. Prada USA Corp.*, 484 Fed. Appx. 99, 100 (9th Cir. 2012)(court quoted California state court finding that the "demotion of an employee or criticism of his [or her] job performance – even if alleged to be unfair or outrageous – does not . . . create the intolerable working conditions necessary to support a claim of constructive discharge.")

Garmon has failed to present evidence that Plaid intentionally created or maintained intolerable work conditions that would cause a reasonable person to quit. Plaid is entitled to summary judgment on Garmon's Fourth Claim for Relief for wrongful discharge.

*Conclusion*

Plaid's motion (#12) for summary judgment is DENIED with respect to Garmon's claims under the Federal Act, the State Act, and the Whistleblower Statute based on Plaid's failure to schedule Garmon for full-time work and refusal to promote him to store manager because of his part-time hours and resulting inability to perform assistant manager tasks, and GRANTED in all other respects. Plaid's motion to strike, found in it's reply brief, is GRANTED with regard to paragraphs 120 and 121 of Garmon's affidavit but DENIED in all other respects.

DATED this 19th day of July, 2013.

JOHN V. ACOSTA
United States Magistrate Judge